## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRITTANY STOUT, | |
| Plaintiff, | Case No. _____ |
| v. | JURY TRIAL DEMANDED |
| HARVEST HEALTH & RECREATION INC., MARK N. BARNARD, STEVEN M. WHITE, ELROY P. SAILOR, ANA DUTRA, EULA L. ADAMS, and MICHAEL SCOTT ATKISON, | |
| Defendants. | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Brittany Stout ("Plaintiff"), by her undersigned attorneys, for this Complaint against Defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.       This is an action brought by Plaintiff against Harvest Health & Recreation Inc. ("Harvest" or the "Company") and the members of the Company's board of directors (the "Board" or the "Individual Defendants" and, together with Harvest, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Harvest by Trulieve Cannabis Corp. ("Trulieve") (the "Proposed Transaction").

2.       On May 10, 2021, Harvest entered into an arrangement agreement (the "Arrangement Agreement") with Trulieve, pursuant to which Harvest's shareholders will receive

0.1170 Trulieve Subordinate Voting Shares for each outstanding Harvest Subordinate Voting Share that they own (the "Exchange Ratio"). Upon the closing of the Proposed Transaction, Harvest shareholders are expected to own approximately 26.7% of the post-close combined company.

3.      In order to convince the Company's public shareholders to vote in favor of the Proposed Transaction, on July 13, 2021, Defendants authorized the filing of a definitive Schedule 14A Proxy Statement with the SEC (the "Proxy"). As described below, the Proxy is materially incomplete and misleading in violation of Sections 14(a) and 20(a) of the Exchange Act. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the process that culminated in the Proposed Transaction, and (ii) one of the Company's financial advisors, Haywood Securities Inc. ("Haywood").

4.      On July 21, 2021, Plaintiff sent amicable demand to the Company outlining these issues. To date, the Company has not responded. What is more, the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled for **August 11, 2021** (the "Shareholder Vote"), and it is imperative that the material information omitted from the Proxy be disclosed prior to the Shareholder Vote, so the Company's shareholders can properly exercise their corporate voting rights.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks either to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to the Company's shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants'

violations of the Exchange Act.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's Subordinate Voting Shares trade on the OTCQX, which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Harvest Subordinate Voting Shares.

10.     Defendant Harvest is incorporated under the Business Corporations Act of British Columbia, Canada. The Company's registered office is located at 885 W. Georgia Street, Suite 2200, Vancouver, British Columbia V6C 3E8 Canada, and it maintains its principal executive office at 1155 W. Rio Salado Parkway, Suite 201, Tempe, Arizona 85281.  The Company is a reporting issuer in Canada, with its Subordinate Voting Shares listed for trading on the Canadian Securities Exchange (the "CSE") under the symbol "HARV." The Company is also a U.S. domestic reporting issuer registered with the SEC, and its Subordinate Voting Shares trade on the OTCQX tier of the OTC Markets (the "OTCQX") under the symbol "HRVSF."

11.     Defendant Mark N. Barnard ("Barnard") is, and has been at all relevant times, the Chairman of the Board of Harvest.

12.     Defendant Steven M. White ("White") is, and has been at all relevant times, the Chief Executive Officer ("CEO") and a director of Harvest. White is also a co-founder of Harvest.

13.     Defendant Elroy P. Sailor is, and has been at all relevant times, a director of Harvest.

14.     Defendant Ana Dutra is, and has been at all relevant times, a director of Harvest.

15.     Defendant Eula L. Adams is, and has been at all relevant times, a director of Harvest.

16.     Defendant Michael Scott Atkison ("Atkison") is, and has been since May 2020, a director of Harvest

17.     Defendants identified in paragraphs 11 through 16 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.      Relevant Corporate Background

18.    Harvest is one of the largest multi-state, vertically integrated operators in the United States cannabis industry that operates from "seed to sale." The Company was established in Arizona, where it received its first license in 2012. The Company has since expanded its operational footprint to nine U.S. markets, including Arizona, California, Colorado, Florida, Maryland, Nevada, North Dakota, Pennsylvania, and Utah, and it also has two provisional licenses in Massachusetts.

19.    In November 2018, the Company became a publicly-traded company through a series of transactions with RockBridge Resources Inc. In connection therewith, the Company implemented a three-class voting structure, including the creation of a new class of subordinated voting shares (the "Subordinate Voting Shares"), a new class of multiple voting shares (the "Multiple Voting Shares"), and a new class of super voting shares (the "Super Voting Shares"). Each Subordinate Voting Share carries the right to one vote per share on all matters to be voted on by shareholders; each Multiple Voting Share carries the right to 100 votes per share on all matters to be voted on by shareholders; and each Super Voting Share carries the right to 200 votes per share on all matters to be voted on by shareholders.

20.    Shortly after becoming a publicly-traded company, Harvest engaged in an ambitions acquisition strategy – that ultimately backfired. In March 2019, the Company announced that it was acquiring Verano Holdings for $850 million – one of the largest acquisitions ever announced in the marijuana industry. But that deal was terminated a year later in March 2020. In April 2019, Harvest announced the acquisition of CannaPharmacy, Inc., but then terminated the deal in November 2019. Similarly, in February 2019, Harvest announced that it was acquiring

Falcon International Corp. ("Falcon"), and then in January 2020 filed a lawsuit against Falcon alleging material misstatements by Falcon and demanding, in part, over $50 million that Harvest had loaned to Falcon and paid to certain of Falcon's control persons in connection with that deal, thus raising questions regarding the Company's due diligence processes and oversight. Then, in July 2019, Harvest announced that it had entered into a term sheet for a secured term loan of up to US$225 million from an investment fund managed by Torian Capital Partners, but that deal likewise fell apart in November 2019.

21.     In March 2020, Harvest announced that Jason Vedadi ("Vedadi"), a co-founder of Harvest and then Executive Chairman of the Board, was stepping down immediately. In connection with his resignation, Vedadi agreed to (i) exchange 1,000,000 Super Voting Shares held by Karma Capital LLC, a company controlled by Vedadi, for 10,200 Multiple Voting Shares held by Razor Investments, LLC (a company controlled by Individual Defendant White, a co-founder and the CEO of Harvest) and (ii) forego 2,500,000 stock options and any cash compensation provided for in his employment agreement. These transactions had the effect of **consolidating voting control of Harvest in Individual Defendant White**: as of December 31, 2020, White held approximately 52.46% of the voting power of Harvest, and thus has "the ability to control the outcome of all matters submitted to [Harvest] shareholders for approval, including the election and removal of directors and any arrangement or sale of all or substantially all of [the Company's] assets."[1]

22.     Also notably, White is party to a three-year employment agreement with Harvest, commencing on or about November 15, 2018, which provides for certain termination and change of control benefits, including in the event of a change of control, five times his annual base salary,

---

[1]     In connection with the Proposed Transaction, "Harvest Shareholders holding more than 50% of the voting power of the issued and outstanding Harvest Shares have entered into voting support agreements with Trulieve to vote in favor of the Transaction."

two years bonus, and health benefits for 24 months. White also holds 2,500,000 Harvest Options, which were (and remain) substantially underwater:

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|---|
| Steven M. White, Chief Executive Officer and Director | 27,739 | 27,739 | — | $ 7.21 | 11/14/2023 |
| | 1,222,261 | 1,222,261 | — | $6.55 | 11/14/2028 |

On December 1, 2020, the approximate commencement of the Company's sales process, described below, the Company's shares on the OTCQX closed at $2.02 per share, up from its March 18, 2020 low of $0.46 per share; on May 7, 2021, the last trading day before the Arrangement Agreement was executed, the closing price was $3.58 per share.

23.    Accordingly, as described below, following the Company's recent troubled past, Individual Defendant White consolidated power and control over the Company and steered it into a sale – via a flawed and inadequate process – that would result in immediate personal financial benefits as a result of a change of control transaction and conversion of his existing underwater equity awards into equity in Trulieve.

**II.    Events Leading to the Execution of the Arrangement Agreement**

24.    The Proxy indicates that, though it did not conduct a *formal* sales process, the Company was regularly in discussions with a variety of different counterparties with respect to strategic transactions and entered into confidentiality agreements with other potential counterparties, but which discussions did not lead to any transaction. **Importantly, however, the Proxy fails to disclose whether these confidentiality agreements contained standstill provisions and, if so, whether the standstill provisions were subject to "don't ask, don't waive" ("DADW") conditions and/or are still in effect or fell away upon the execution of the Arrangement Agreement.**

25.     According to the Proxy, the Proposed Transaction had its particular genesis in "early December 2020," when the CEO of Trulieve contacted White to discuss a transaction between their companies. Apparently eager for transaction, *less than three days later*, on December 3, 2020, White caused Harvest and Trulieve to enter into a confidentiality agreement. Over the next month, White continued discussions with Trulieve, which discussions included high level business discussions with the companies' respective CFOs and Trulieve's financial advisor. On January 8, 2021, Trulieve presented a draft letter of intent to Harvest. Between January 8 and January 11, 2021, the CEO of each of Trulieve and Harvest discussed the draft letter of intent, with a focus on considering the refinancing opportunities for Harvest.

26.     Then, on January 11, 2021, Trulieve sent Harvest a revised draft of a preliminary letter of intent outlining its initial proposal. **The Proxy does not disclose the terms of this initial proposal (or the prior draft letter of intent).** Discussions and due diligence investigations ensued between the senior management teams of Harvest and Trulieve, and certain *undisclosed* members of the Board became engaged in these discussions. Notably, it is unclear from the Proxy when the Board met to discuss the Company's interactions with Trulieve. Rather, on January 13, 2021, the Board met for the *apparent* first time, at which time it noted receipt of the letter of intent from Trulieve and authorized management to respond to the draft terms.

27.     On January 22, 2021, the same day that recreational sales of cannabis began in Arizona, White and the Company's CFO briefed Dan Reiner and Individual Defendant Atkison[2] on the Trulieve letter of intent and the commercial issues between the companies. Mr. Reiner holds

---

[2]     Atkison was appointed to the Board in connection with the Company's March 2020 merger with Interurban Capital Group, Inc ("ICG"). As noted below, Atkison would later be appointed to the Harvest Special Committee. Notably, following the Company's acquisition of ICG, in June 2020, Harvest sold ICG to a wholly owned subsidiary of Hightimes Holding Corp. following the spinoff of certain assets. The Company is also engaged in litigation related to its acquisition of ICG.

approximately 4.7% of the voting stock in the Company and is described in the Proxy as a "Special Advisor" to the Company. **The Proxy does not disclose why these two individuals were separately briefed on the discussions and "commercial issues" between Harvest and Trulieve, and Harvest's other public filings make no reference to Mr. Reiner as a "Special Advisor" to the Company.**

28.    Thereafter, and through February 2021, the parties continued discussions and negotiations, including the *exchange of financial analyses* supporting the parties' respective positions on the proposal price of a transaction. **Notably, it does not appear that Harvest had engaged, and/or was being advised by, a financial advisor throughout these negotiations.** Nevertheless, on February 26, Trulieve transmitted to Harvest a revised non-binding proposal for an all-stock acquisition, which proposal also contemplated a 45-day exclusivity period (the "Proposal Letter"). **Again, the Proxy fails to disclose the value of this proposal.** Also, on February 23 and 24, 2021, White met with representatives of Company A to discuss a potential transaction between the two companies, as well as management and corporate philosophy.

29.    On March 1, 2021, the Board convened with "Special Advisor Dan Reiner" to discuss the Proposal Letter. White provided an overview of Trulieve's proposal and his discussions with Company A. Thereafter the Board determined that Trulieve "offered enhanced value for Harvest Shareholders relative to a proposed combination with Company A" and instructed White to continue to negotiate the terms of Trulieve's proposal. **Notably, though, the Proxy does not disclose any information regarding the valuation of the proposal conveyed by Company A to Harvest (or the valuation of Trulieve's proposal).** Nevertheless, on March 7, 2021, Harvest entered into the Proposal Letter with Trulieve.

30.    On March 11, 2021, Trulieve provided Harvest with an initial draft of the

Arrangement Agreement. On March 12, 2021, the "Board met and received and considered, among other things, an update on discussions with Trulieve" and determined to "consider the formation of any committees and appointment of outside advisors to assist with the potential transaction." On March 14, 2021, the Board met with Harvest management and Harvest's legal counsel and authorized the formation of the Harvest Special Committee, which consisted of Individual Defendants Barnard, as Chair, Eula L. Adams, Atkison, and Ana Dutra. The mandate of the Harvest Special Committee included the review and analysis of the Trulieve Proposal Letter, the engagement of advisors to assist in this work and the consideration of alternatives to the proposal, and making any recommendations in relation thereto to the Harvest Board. **It is unclear whether the Special Committee had the authority to reject the Trulieve Proposal.** The Board also received an update regarding potential financial advisors to Harvest in connection with the transaction and authorized engagement with Moelis & Company LLC ("Moelis") as financial advisor to Harvest, which Harvest formally engaged on April 14, 2021.

31.    Following the March 14, 2021 meeting, and through May 9, 2021, Harvest, Trulieve, and their advisors engaged in due diligence and negotiations toward a transaction. Notably, despite being empowered and directed to consider alternatives to the Proposal Letter, the Special Committee repeatedly authorized the extension of exclusivity with Trulieve, and, consequently, it does not appear that the Company ever considered any other strategic alternative. On April 26, 2021, the Special Committee authorized the retention of a second financial advisor and, on April 30, 2021, entered into a formal engagement letter with Haywood.  Haywood delivered its fairness opinion to the Board on May 9, 2021.

32.    On May 10, 2021, the Board executed the Arrangement Agreement and the parties jointly announced the Proposed Transaction. The press release provided in part:

**Trulieve Announces the Largest US Cannabis Transaction; Acquisition of Harvest Health & Recreation Inc., Creates the Most Profitable Multi-State Operator in the World's Largest Cannabis Market**

\*\*\*

Tallahassee, FL, and Phoenix, AZ, May 10, 2021 - Trulieve Cannabis Corp. ("**Trulieve**" or the "**Company**") (CSE: TRUL) (OTC: TCNNF) and Harvest Health & Recreation Inc. ("**Harvest**") (CSE: HARV, OTCQX: HRVSF) are pleased to announce they have entered into a definitive arrangement agreement (the "**Arrangement Agreement**") pursuant to which Trulieve will acquire all of the issued and outstanding subordinate voting shares, multiple voting shares and super voting shares (the "**Harvest Shares**") of Harvest (the "**Transaction**"). Under the terms of the Arrangement Agreement, shareholders of Harvest (the "**Harvest Shareholders**") will receive 0.1170 of a subordinate voting share of Trulieve (each whole share, a "**Trulieve Share**") for each Harvest subordinate voting share (or equivalent) held (the "**Exchange Ratio**"), representing total consideration of approximately $2.1 billion based on the closing price of the Trulieve Shares on May 7, 2021.

Trulieve, a leading multi-state operator with a focus on the northeast and southeast regions of the United States, and Harvest, a leading multi-state operator with a focus on the west coast and northeast regions of the United States, have built deep, vertically integrated operations in their key markets, becoming leading operators in the United States, the world's largest regulated cannabis market.

Upon completion of the Transaction, as well as the closing of other previously announced acquisitions by Harvest and Trulieve, the combined business will have operations in 11 states, comprised of 22 cultivation and processing facilities with a total capacity of 3.1 million square feet, and 126 dispensaries serving both the medical and adult-use recreational cannabis markets.

\*\*\*

**Management Commentary**

"Today's announcement is the largest and most exciting acquisition so far in our industry, creating the most profitable public multi-state operator. Importantly, our companies share similar customer values with a focus on going deep in core markets. This combination offers us the opportunity to leverage our respective strong foundations and propel us forward with an unparalleled platform for future growth," stated Kim Rivers, Chief Executive Officer of Trulieve. "Harvest provides us with an immediate and significant presence in new and established markets and accelerates our entry into the adult use space in Arizona. Trulieve and Harvest are leaders in our markets, recognized for our innovation,

brands, and operational expertise with true depth and scale in our businesses. We look forward to providing best-in- class service to patients and customers on a broader national scale as we create an iconic US cannabis brand."

"We are thrilled to be joining Trulieve, a company that has achieved unrivaled success and scale in its home state of Florida," said Steve White, Chief Executive Officer of Harvest. "As one of the oldest multi- state operators, we believe our track record of identifying and developing attractive market opportunities combined with our recent successful launch of adult use sales in Arizona will add tremendous value to the combined organization as it continues to expand and grow in the coming years."

**Terms of the Transaction**

The Transaction will be effected by way of a plan of arrangement pursuant to the *Business Corporations Act* (British Columbia). Under the terms of the Arrangement Agreement, Trulieve will acquire all of the issued and outstanding Harvest Shares, with each Harvest Shareholder receiving 0.1170 of a Trulieve Share for each Harvest Share, implying a price per Harvest Share of US$4.79, which represents a 34% premium to the May 7, 2021 closing price of the Harvest Shares. After giving effect to the Transaction, Harvest Shareholders will hold approximately 26.7% of the issued and outstanding pro forma Trulieve Shares (on a fully-diluted basis). The Exchange Ratio is subject to adjustment in the event that Harvest completes certain interim period refinancing measures, with the potential adjustment in proportion to the incremental costs from such financing relative to the Transaction value. Additional details of the Transaction will be described in the management information circular and proxy statement (the "**Circular**") that will be mailed to Harvest Shareholders in connection with a special meeting of Harvest Shareholders (the "**Meeting**") expected to be held in the third quarter to approve the Transaction.

The Transaction has been unanimously approved by the Boards of Directors of each of Trulieve and Harvest. Harvest Shareholders holding more than 50% of the voting power of the issued and outstanding Harvest Shares have entered into voting support agreements with Trulieve to vote in favor of the Transaction.

The Arrangement Agreement provides for certain customary provisions, including covenants in respect of non-solicitation of alternative transactions, a right to match superior proposals, US$100 million reciprocal termination fees under certain circumstances and reciprocal expense reimbursement provisions in certain circumstances.

The Transaction is subject to, among other things, the approval of the necessary approvals of the Supreme Court of British Columbia, the approval of two-thirds of the votes cast by Harvest Shareholders at the Special Meeting, receipt of the required regulatory approvals, including, but not limited, approval pursuant to

the Hart–Scott–Rodino Antitrust Improvements Act, and other customary conditions of closing. Approval of Trulieve Shareholders is not required. Additional details of the Transaction will be provided in the Circular.

The Board of Directors of Harvest (the "**Harvest Board**") has unanimously determined, after receiving financial and legal advice and following the receipt and review of a unanimous recommendation of a special committee of independent directors (the "**Special Committee**"), that the Transaction is in the best interests of Harvest, and that, on the basis of the Fairness Opinion (as defined herein), that the consideration to be received by the Harvest Shareholders is fair, from a financial point of view, to the Harvest Shareholders.

The Harvest Board unanimously recommends that Harvest Shareholders vote in favour of the resolution to approve the Transaction. The Special Committee obtained a fairness opinion from Haywood Securities Inc., (the "**Fairness Opinion**") which provides that, as at the date of such opinion and based upon and subject to the assumptions, procedures, factors, limitations and qualifications set forth therein, the consideration to be received by the Harvest Shareholders pursuant to the Transaction is fair, from a financial point of view, to the Harvest Shareholders.

33.     Also on May 10, 2021, the Company reported its first quarter financial results, reporting revenue of $88.8 million, up 101% from the first quarter 2020 and 27% sequentially, and Adjusted EBITDA of $26.9 million, up 196% compared to $9.1 million in the fourth quarter of 2020, primarily due to the launch of recreational sales in Arizona, and which caused the Company to raise its full year 2021 revenue target. Therefore, the announcement of the Proposed Transaction artificially capped the share price of Harvest, which has also since declined as a result of Trulieve's performance in the market:



34.     In sum, following the Company's disastrous 2019-2020 and failed M&A activity, it appears that White consolidated voting power and pushed the Company into a sale with Trulieve on unfair economic terms. Indeed, it appears as though White controlled negotiations between the Company and potential transaction partners until the Company executed the Proposal Letter and entered into exclusivity with Trulieve. Only then, after the transaction's terms were already set, did the Board establish the Special Committee to aid it in the evaluation of the Proposed Transaction. Finally, as described below, the Proxy fails to disclose sufficient information necessary for shareholders to evaluate the propriety of the Board and Special Committee's oversight of the process and negotiation of the transaction terms.

**III.     The Proxy Omits Material Information**

35.     In connection with the Proposed Transaction, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy to ensure it did not contain any material misrepresentations or omissions before it was filed and disseminated to the Company's shareholders. However, the Proxy misrepresents or omits material information necessary for the Company's shareholders to make an informed decision regarding the Proposed Transaction, in violation of Sections 14(a) and

20(a) of the Exchange Act and SEC Rule 14a-9.

36.    First, the Proxy fails to disclose sufficient information regarding the proposals the Company received from Trulieve and Company A, and/or any other proposal it received in connection with its evaluation of strategic alternatives, including but not limited to the draft letter of intent between the Company and Trulieve and the Proposal Letter. The dearth of information regarding the letter of intent and the Proposal Letter alone effectively prevents shareholders from evaluating the process undertaken by the Board and Special Committee, as shareholders are unable to determine whether the terms of the proposals materially differ from the Exchange Ratio and the transaction contemplated by the Arrangement Agreement.

37.    Second, the Proxy fails to disclose sufficient information regarding the powers and authority of the Special Committee, including whether the Special Committee was empowered to (i) reject a transaction with Trulieve and/or (ii) conduct any market outreach.

38.    Third, the Proxy fails to disclose sufficient information concerning Haywood and its financial analyses. More specifically, the Proxy entirely omits the financial analyses performed by Haywood. And, while Haywood's fairness opinion is included as Appendix "H" to the Proxy, it merely includes a description of the analyses performed, and fails to disclose the assumptions and inputs utilized by Haywood and the actual, quantitative results observed in the analyses. The Proxy likewise fails to disclose sufficient information regarding the potential conflicts of interest faced by Haywood in connection with its engagement. Although, as of the date of its fairness opinion, "Haywood's clients and members of its pro group h[eld] an aggregate 16,841,492 Subordinate Voting Shares of Harvest, 500,000 of Harvest's 9.25% debentures due December 20 2022, and 5,228,750 Subordinate Voting Shares of Trulieve," the Proxy fails to disclose whether Haywood has previously performed additional services and/or received compensation from

Harvest, Trulieve, any Board member, and/or their respective associates and affiliates.

39.     <u>Fourth</u>, the Proxy fails to disclose whether the confidentiality agreements executed by the Company in connection with its evaluation of strategic alternatives included standstill and/or DADW provisions and/or whether these provisions are still in effect.

* * *

40.     In sum, and for the reasons described herein, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote her shares in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

41.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

43.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44.     The omission of information from a registration statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45.     Defendants have issued the Proxy with the intention of soliciting the Company's public common stockholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, *inter alia*, the process that culminated in the Proposed Transaction and potential conflicts of interest faced by the Company's financial advisor.

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

47.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. Indeed, the Individual Defendants were privy to and had knowledge of the process leading up to the signing of the Arrangement Agreement and preparation and review of the Proxy. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

48.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Arrangement Agreement and the preparation and review of the Proxy.

49.    Harvest is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

50.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Harvest within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Harvest, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

55.     In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Arrangement Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

      D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 27, 2021

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina
Brian C. Mears
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: 504.455.1400
Direct: 504.648.1843
Facsimile: 504.455-1498
michael.palestina@ksfcounsel.com
brian.mears@ksfcounsel.com

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*